## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

JASPER MCINTOSH,

    Defendant.

CRIMINAL ACTION FILE NO.

1:18-cr-0431-MLB-AJB

(Superseding)

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Defendant Jasper McIntosh, who is charged in the superseding indictment with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g) and 924(e), moves to suppress evidence, [Doc. 17], and statements, [Doc. 18], and to dismiss the superseding indictment. [Doc. 56]. The Court held evidentiary hearings on the suppression motions, [Doc. 26 (hereinafter "T1:_"); Doc. 36 (hereinafter "T2:_")], after which the parties filed briefs, [Docs. 39 (Government), 50 (McIntosh), 53 (Government)]. For the following reasons, the Court **RECOMMENDS** that the motions be **DENIED**.[1]

---

[1] McIntosh states in his post-evidentiary hearings brief that he has not located any inculpatory post-arrest statements that the Government intends to use at trial. [Doc. 50 at 11 n.11]. As a result, the undersigned **RECOMMENDS** that McIntosh's motion to suppress statements, [Doc. 18], be **DENIED AS MOOT**,

## I.   <u>MOTION TO DISMISS SUPERSEDING INDICTMENT, [DOC. 56]</u>

In this motion, McIntosh moves to dismiss the superseding indictment on the grounds that 18 U.S.C. § 922(g) is unconstitutional as applied to him because the statute exceeds Congress' statutory authority under the Commerce Clause, since his alleged possession of the firearm was purely intrastate and did not affect commerce.   He recognizes that in *United States v. McAllister*, 77 F.3d 387 (11th Cir. 1996), and *United States v. Jordan*, 635 F.3d 1181 (11th Cir. 2011), the Eleventh Circuit held that the Commerce Clause requires only a "minimal nexus" to interstate commerce and that § 922(g) is constitutional as long as the Government proves that that the firearm possessed by the felon traveled in interstate commerce, [Doc. 56 at 1 n.1, 10-11, 16-18]; and states that he is raising the issue to preserve it.   [*Id.* at 1 n.1].   He also contends that the evidence will demonstrate that the firearm at issue was manufactured in Connecticut in 2012 and purchased on two occasions in Georgia by other persons from federally-licensed firearms dealers before the Government contends that he possessed it on September 23, 2018, such that his alleged possession bears absolutely no connection to interstate commerce.   [*Id.* at 18-19].

---

subject to renewal if the Government identifies any post-arrest statements it seeks to introduce at trial.

As McIntosh appears to recognize, the district court is bound by Eleventh Circuit precedent and is not empowered to simply ignore that precedent to make new law. *See In re Hubbard*, 803 F.3d 1298, 1309 (11th Cir. 2015) (finding error where "district court inadvertently transgressed the fundamental rule that courts of this circuit are bound by the precedent of this circuit."); *Springer v. Wal-Mart Assocs.' Group Health Plan*, 908 F.2d 897, 900 n.1 (11th Cir. 1990) ("[T]he district court is bound by controlling Eleventh Circuit precedent.") (emphasis removed).[2] As a result, the Court is not authorized to ignore binding Eleventh Circuit precedent, and therefore recommends that McIntosh's motion be denied on the authority of *McAllister* and *Jordan*.

Furthermore, in ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment and, more specifically, the language used to charge the crimes. *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006) (citing *United States v. Critzer*, 951 F.2d 306,

---

[2]     To the extent that Defendant argues that *United States v. Lopez*, 514 U.S. 549 (1995), affords an argument that § 922(g) operates unconstitutionally where the only interstate commerce nexus is the mere fact that firearms had previously traveled interstate, the Eleventh Circuit also has specifically rejected a *Lopez*-based challenge to § 922(g), and has found that the minimal interstate nexus test whereby a firearm had "previously traveled in interstate commerce" is a permissible basis to apply the statute. *See McAllister*, 77 F.3d at 390.

3

307 (11th Cir.1992)).   A court may not "dismiss an indictment . . . on a determination of facts that should have been developed at trial." *Id*. (quoting *United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987)).  Therefore, the Court cannot consider what the evidence at trial might be in ruling on the motion. The superseding indictment contains the jurisdictional language charging that McIntosh knowingly possessed a firearm in and affecting interstate and foreign commerce, and therefore is sufficient to cause a trial on the general issue.  *See United States v. Baxter*, 579 Fed. Appx. 703, 706 (11th Cir. Aug. 21, 2014) (holding that indictment sufficiently charged defendant with being felon in possession by presenting essential elements of the offense—i.e., that defendant was a convicted felon, that the defendant had knowledge that he was in possession of a firearm, and that the firearm affected or traveled in interstate commerce—and tracked the language of § 922(g)(1)).[3]

Accordingly, the undersigned **RECOMMENDS** that McIntosh's motion to dismiss the superseding indictment, [Doc. 56], be **DENIED**.

---

[3]     Of course, now the Government also must prove that Defendant knew that he was a convicted felon. *Rehaif v. United States*, 588 U.S. ---, ----, 139 S. Ct. 2191, 2195-96 (2019).

II.    **MOTIONS TO SUPPRESS EVIDENCE, [DOC. 17]**

   A.    **FACTS**

   The facts for purposes of the motions to suppress are these. On September 23, 2018, at approximately 7:44 PM, Atlanta Police Department (APD) Officers Dougherty and Grant (who was driving) were patrolling in a marked APD vehicle in the Zone 3 area of Atlanta, when they saw McIntosh riding a small motorbike or moped traveling northbound in the righthand lane of Metropolitan Parkway, heading towards Cleveland Avenue. T1:7-8. Dougherty initially saw him in the lane of traffic and then saw McIntosh move over to the bike lane. T1:112, 113, 162. It was dusk and other vehicles on the road had lights illuminated. T1:8. McIntosh was traveling in the opposite direction of the officers, but they noticed that he was not wearing a helmet and the vehicle did not have any lights on. T1:8. The officers' vehicle was in the left-hand turn lane on Metropolitan getting ready to turn onto Cleveland. T1:39-40; Def. Ex. 3. The officers saw McIntosh turn right on Cleveland, and although Dougherty testified that they turned around to pursue him, T1:9, actually they just waited for the light to turn so that they could follow him. T1:44.[4] The officers saw McIntosh in the lane of traffic

_____

[4]    Grant's body camera reflects that the officers made a U-turn on Cleveland near Forest Hills Drive. T1:139. The discrepancy does not affect the Court's view

on Cleveland.  T1:136, 161-62.  He was not wearing a helmet.  T1:135.

After McIntosh turned right on Forest Hills Drive (about one-half mile from the Cleveland/Metropolitan intersection), the officers turned on their blue lights and siren to conduct a traffic stop.  T1:10.  McIntosh was in the lane of traffic. T1:112, 113, 134, 146.[5]  At first, McIntosh yelled at the officers and motioned them to move around him.  T1:10, 113.  After the officers told him several times to pull over, McIntosh turned from the middle of the righthand lane of traffic on Forest Hills Drive into a driveway on the left and turned around, ending up facing the police car's driver's door.  T1:10, 58-59, 113, 148.  He appeared agitated.  T1:10. The stop occurred about .4 miles from the intersection of Cleveland Avenue and Forest Hills Drive.  T1:147.  The officers told him to get out of the roadway and to pull into the driveway on the left, and McIntosh complied.  T1:150, 151.

Dougherty, who was the passenger in the patrol car, was wearing a body cam that records and stores video images until the control is double-tapped, and then both video and audio are recorded.   T1:11, 104, 113.   The camera system

---

of the officers' credibility nor the legitimate basis for performing a traffic stop for McIntosh's failure to wear a helmet.

[5]     Although there is a bike lane on Cleveland Avenue that McIntosh used in order to turn right onto Forest Hills Drive, there is no bike lane on Forest Hills Drive.  There is a white line in places demarcating the edge of the roadway.  T1:161.

automatically saves video (but not audio) from two minutes prior to the activation and continues saving the recorded footage until the system is turned off.  T1:11. The counter on Dougherty's body cam reflected 1:41 at the time of the stop and his face-to-face encounter with McIntosh.   T1:58.   Upon exiting his police car, Dougherty asked McIntosh why he was not wearing a helmet.  Govt. Ex. 1 at 2:00-02.  McIntosh replied that he had gone to get gas, and his home was nearby.  Govt. Ex. 1 at 2:02-05.  Dougherty asked McIntosh for his driver's license but McIntosh stated that it was at home.  T1:12, 64; Govt. Ex. 1 at 2:25-29.  Dougherty asked McIntosh for his name and date of birth, and McIntosh complied.   T1:63. Dougherty and Grant told him to step away from the motorbike, in order to separate him from the vehicle if he chose to flee.  T1:12-13, 152.[6]  Dougherty noticed that McIntosh was wearing a firearm in a holster on his right hip.  T1:13; Govt. Exs. 4A-4D.  However, Dougherty conceded that it is legal to carry a firearm in Georgia, so he was not initially concerned.  T1:64.  He also told McIntosh that he was not arresting him for the helmet violation.  T1:66-67.

Dougherty returned to the police vehicle to run a check on the Mobile Data Terminal through the ISIS system to see if McIntosh had a valid driver's license.

---

[6]     McIntosh stated that he could not turn off the engine or it would not restart. T1:12-13.

T1:14, 70.  Grant stayed with McIntosh and tried to keep him calm because he was "so amped up."  T1:118-19.  Grant saw McIntosh call his wife on his cell phone, telling her to bring his identification and perhaps a helmet.  T1:156-57.  The ISIS program that Dougherty used has the ability to run vehicle registrations and drivers' licenses, and also displays warrants and probation or parole hits.  T1:69.  Dougherty utilized the ISIS system first because it already was running in the patrol vehicle and, for a simple traffic stop, it is more expedient and also immediately displays any warrants.  T1:106.  Dougherty described the database search on that system as limited.  T1:14-15.  Dougherty also checks criminal history on every traffic stop.  T1:99.  The CAD report[7] reflects that Dougherty performed this check at 7:45:57 PM.  T2:211; Def. Ex. 10 at 2.  Dougherty determined at 5:48 on the body cam video that McIntosh had a valid license for the information that he gave him.  T1:70, 77.  Dougherty testified that in inputting a person's name and date of birth into the ISIS system, various tabs on a dropdown menu are displayed (such as "person" or "NCIC"), and the operator clicks on the various tabs to view the message(s) displayed.  T1:74-75, 108.  The tabs appear even if the person being investigated

---

[7]      The CAD (or computer-assisted dispatch) report is generated by the APD on all calls, combining some automatically recorded entries and information manually inputted by dispatchers.  T2:200.

had no valid driver's license or did not have a criminal history. T1:108-09. Therefore, instead of logging out of ISIS after getting the driver's license information and going to another system (OMNIXX) to view the driver's license photograph, Dougherty clicked on all of the ISIS tabs and obtain a hit for federal probation/supervised parole, leading him to believe that McIntosh was on federal supervision, but at that point he did not know the underlying offense or whether it was for a felony conviction. T1:16-17, 79-80, 81; *see also* Govt. Ex. 1 at 5:55-6:48. Nonetheless, as a precaution, he called for backup because McIntosh was a large man, had a firearm, and was agitated. T1:17, 82, 104-05; Govt. Ex. 1 at 6:36-7:26. He also decided to investigate further because of the firearm and federal probation hit. T1:82-83.

At that point, Dougherty accessed the OMNIXX program, another on-line database that allows him to obtain a photograph of the person and run a criminal history. T1:17, 83-84; Govt. Ex. 1 at 7:45-8:10. Although ISIS and OMNIXX contain the same information, in OMNIXX he could get more information and perform additional searches. T1:18. He first had to minimize the ISIS platform in order to access the internet and log onto the OMNIXX system with log-in information and a password. T1:18. He then entered the information that McIntosh gave him in order to pull up a driver's license. T1:19. The OMNIXX program

9

produces a series of messages with information about driver's licenses, warrants, and supervision, and they appear at the same time, but like the ISIS program, a user has to click on each individual message. T1:85, 87; Got. Ex. 1 at 8:59-9:39.  By 7:51 PM, he was able to see McIntosh's driver's license photo (confirming that this was the same person that the officers had encountered) and he also obtained the same supervised federal parole/probation hit on the same name and date of birth that McIntosh had previously given him.  T1:19-20, 21, 80, 86; Govt. Exs. 1 at 8:59-9:09, 5, 6.  Dougherty checked on the status of the backup and APD Officer Hansen reported that he was nine to ten minutes away; as a result Dougherty stalled for time.  T1:24, 25, 94 (telling McIntosh that he was still trying to figure out his identity).  Dougherty also ran McIntosh's criminal history (after he researched and obtained his FBI or Georgia criminal history index number), receiving that report at approximately 7:53 PM.  T1:26-27, 89, 96-97; Govt. Ex. 1 at 9:39-13:00.[8]  As a result, he discovered that McIntosh was a convicted felon.  T1:27, 96; Govt. Ex. 7 at 3.[9]  Two minutes and 15 seconds had elapsed since he initially received

_____

[8]      Extra steps are required on OMNIXX to get a criminal history as opposed to a driver's license.  T1:97.

[9]      The printout of McIntosh's GCIC is 31 pages long.  Govt. Ex. 7.  The third page indicates that he was a convicted felon.

10

notification of a probation hit.  T1:90; Govt. Ex. 5.  Slightly less than 12 minutes

had elapsed since the initial stop.  T1:96.  At this point, Dougherty intended to

arrest McIntosh for being a felon in possession of a firearm.  T1:98.

While Dougherty was performing his computer queries, Grant was with

McIntosh, trying to keep him calm and talking to him in a conversational tone about

the need to wear a helmet.  T1:118-19, 169, 171-72; Govt. Ex. 2 (Grant body cam

video) at 6:20-15:03.  McIntosh was not handcuffed and was able to use his cell

phone.  T1:156-57.  Grant did not take out his weapon.  T1:118.  McIntosh stated

that his motorbike had a maximum speed of 15 to 25 mph.  Govt. Ex. 2 at 7:55.

Grant figured that Dougherty was taking some time so there must have been a

problem.  T1:172.

Ultimately, due to further delay on backup's arrival and the arrival of a

civilian vehicle (towards which McIntosh started to approach and Dougherty told

Grant to not let McIntosh approach), Dougherty decided to place McIntosh under

arrest.   T1:100, 105, 119, 179.   However, McIntosh resisted, struggled with

Dougherty and Grant, and fled, before Dougherty caught up to him and tasered

McIntosh twice.  McIntosh was tasered again by Officer Hanson, who arrived as

backup.  T1:37, 100-01.  Dougherty grabbed the firearm off of McIntosh's waist and threw it into the brush.  T1:37, 100.[10]

McIntosh was charged with several offenses, including possession of a firearm by a convicted felon, no helmet, and misdemeanor obstruction of an officer. T1:33.  The motorbike McIntosh was operating was impounded.  T1:32.

## II.   DISCUSSION

### A.   ARGUMENTS OF THE PARTIES

The Government contends that the officers had reasonable suspicion to perform a traffic stop on McIntosh because Georgia law requires that persons operating a moped or motorcycle must wear protective headgear, [Doc. 39 at 11-12 (citing O.C.G.A. §§ 40-6-352(a), 40-6-315(a))], regardless of whether the person is in the lane of traffic or on a bike lane.  [*Id.* at 12-13].  The Government also argues that even if McIntosh's vehicle did not qualify as a moped, the officers' actions in stopping McIntosh were not unlawful because it was objectively reasonable for them to believe that he was required to wear a helmet while operating the vehicle.  [*Id.* at 13-14 (citing *Heien v. North Carolina*, 574 U.S. 54, __, 135 S. Ct. 530, 540 (2014)].

---

[10]    Grant did not see that McIntosh was wearing a firearm until he observed the holster after McIntosh was subdued.  T1:120-21.

The Government next argues that the traffic stop was not unreasonably prolonged by Dougherty's checking to determine McIntosh's criminal history.  It contends that determining whether there are any outstanding warrants against a driver is part of the mission of a lawful traffic stop, as long as the officers conduct their investigation diligently and the stop lasts no longer than is necessary to complete its purpose.  [*Id.* at 14 (citing and quoting *Rodriguez v. United States*, 135 S. Ct. 1609, 1614, 1615, 1616 (2015)].  It contends that an officer may prolong the traffic stop beyond its initial purpose where there is reasonable suspicion of additional illegality.  [*Id.* (quoting *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999))].

The Government notes that Dougherty asked McIntosh why he was not wearing a helmet and asked for his driver's license, and when he could not produce one, obtained from him is name and date of birth, a routine and accepted part of an investigative detention under *Terry v. Ohio*, 382 U.S. 1 (1968). [Doc. 39 at 15 (citing *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 186 (2004))].  The Government argues that asking McIntosh for his driver's license was part of the permissible " 'ordinary inquiries' " of a traffic investigation, because Georgia law requires that moped operators be licensed.  [*Id.* (quoting *United States v. Vargas*, 848 F.3d 971, 974 (11th Cir. 2017), and citing O.C.G.A. §§ 40-5-20(a), 40-6-351)].

13

It also argues that any delay in conducting this check was caused by McIntosh's keeping the moped running and not separating from it contrary to the officers' instructions, and that their directions to him to move from the moped did not transform the detention in to an arrest. [*Id.* at 15-16].

The Government further argues that Dougherty reasonably queried McIntosh's information first on the ISIS program because he already was logged into that program on his MDT, and thus it was not necessary that he first go to the OMNIXX program. [*Id.* at 16-17]. It also contends that checking for outstanding warrants or a driver's probation/parole status is proper in order for an officer to safely complete the mission of the traffic stop. [*Id.* at 17-18 (citing *Rodriguez*, 135 S. Ct. at 1615, 1616, which in turn cited *United States v. Holt*, 264 F.3d 1215, 1221 1222 (10th Cir. 2001) (en banc) ("[A] motorist may be detained for a short period while the officer runs a background check to see if there are any outstanding warrants or criminal history pertaining to the motorist even though the purpose of the stop had nothing to do with such prior criminal history."), abrogated on other grounds as stated in *United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007))]. The Government also asserts that Dougherty's actions were less intrusive or time-consuming than in other Eleventh Circuit cases involving criminal-history checks where the court found the officers' actions lawful. [*Id.* at 18 (citing *United States*

14

*v. Purcell*, 236 F.3d 1274, 1278-79 (11th Cir. 2001) (14 minutes to conduct criminal history check not unreasonable); *United States v. Presley*, 645 Fed. Appx. 934, 937-38 (11th Cir. Mar. 14, 2016) (same))].  It then submits that "[i]f a criminal history check is a negligibly burdensome inquiry related to the mission of the traffic stop, surely the less intrusive and time-intensive probation/parole check is too." [*Id.* at 19].  It notes that unlike *United States v. Boyce*, 351 F.3d 1102, 1107 (11th Cir. 2003), where the criminal history check occurred several minutes after the traffic stop investigation ended, here Dougherty performed his probation/parole check as part of his routine computer check in the ISIS program as part of the original traffic stop investigation, and thus was not an unrelated task " 'aimed at detecting criminal activity more generally.' " [*Id.* at 19 (quoting *United States v. Campbell*, 912 F.3d 1340, 1351 (11th Cir. 2019))].  It also submits that checking McIntosh's parole/probation status did not prolong the traffic stop because the information came in at the same time as the driver's license information, and it was reasonable for Dougherty to click on each tab to see if there was any information contained in those categories. [*Id.* at 20].

The Government then asserts that once Dougherty learned that McIntosh was on federal supervised release, he had reasonable suspicion to continue his investigation and detention to determine if McIntosh was a convicted felon,

particularly in light of his possession of the firearm and agitated demeanor. [*Id.* at 20-22 (citing *United States v. Simmons*, 172 F.3d 775, 779 (11th Cir. 1999) (finding continued detention of "Bobby Gene Simmons" reasonable when officer noted warrant for "Bobby Simmons" from another county, the date of birth on the warrant did not match the defendant's, and the warrant was for a worthless check and not a serious crime)]. Finally, it argues that searching the OMNIXX database to confirm McIntosh's identity through a photograph and determine whether his supervision was for a felony was done expeditiously. [*Id.* at 22].

McIntosh responds that the officers' testimony as to circumstances of the traffic stop was not credible and is belied by the body cam footage that demonstrates multiple U-turns, pulling around another vehicle (an event that Grant denied), nor is the speed of the police car consistent with the officers' methodically following a moped traveling at 15 mph. [Doc. 50 at 2-3]. He contends that Dougherty's response to the backup officer that there was "no rush" demonstrates that he was conducting a separate criminal investigation. [*Id.* at 8 (quoting T1:83)].

Thus, he argues that Dougherty transformed a routine traffic stop for failure to wear a helmet into an independent criminal investigation unrelated to the purpose of that stop, in violation of *Rodriguez*. [*Id.* at 11]. He argues that while *Rodriguez*

recognizes that an officer's check for a driver's license and outstanding warrants is part of the ordinary inquiries related to a traffic stop, Dougherty's expansion of his investigation into whether McIntosh was on probation or parole (much less for a felony) was a separate investigation that prolonged the traffic stop in violation of the rule announced in *Rodriguez*. [*Id.* at 22]. Countering the Government's claim that checking on the probation/parole tab in the ISIS program was a negligibly burdensome action, McIntosh argues that given that the probation/parole tab comes up in every ISIS query, Dougherty had no reasonable suspicion to check that tab, and *Rodriguez* and *Campbell* recognize that even a relatively miniscule prolonging of the initial investigation without additional reasonable suspicion is unlawful. [*Id.* at 22-24]. He argues that the Eleventh Circuit has never held that a criminal-history check is a negligibly burdensome precaution that can be undertaken in a routine traffic stop, and contends that in *Boyce* the court held exactly the opposite. [*Id.* at 24].

McIntosh further argues that because the ISIS query into his supervised release status was a separate investigation unsupported by reasonable suspicion, the more time-consuming and detailed OMNIXX investigation likewise unlawfully prolonged the stop. [*Id.* at 27-29]. He also distinguishes *Simmons* on the grounds that, at least in that case, an outstanding warrant, whether for a misdemeanor or

felony, justified an arrest, while simply being on supervision in and of itself, as in this case, does not.  [*Id.* at 29-30].

The Government replies that McIntosh's argument ignores binding Eleventh Circuit precedent that permitted Dougherty to inquire into his criminal history as part of a routine traffic stop investigation.   [Doc. 53 at 3 (citing *Purcell*, 236 F.3d at 1277-78)].   It also points out that the case cited favorably by the Supreme Court in *Rodriguez*, the Tenth Circuit's *Holt* decision, authorized criminal record checks " 'even though the purpose of the stop had nothing to do with such prior criminal history.' "  [*Id.* (quoting *Holt*, 264 F.3d at 1221)].  It also contends that *Boyce* allows a traffic stop to be prolonged detention " 'while waiting for the results of a criminal history check that is part of the officer's routine investigation.' " [*Id.* at 4  (quoting  *Boyce*,  351 F.3d at  1106)].   The  Government also disputes McIntosh's argument that the timing of the criminal history check, which was so important in *Boyce* (it occurred after the traffic stop investigation had ended and the officer was refused consent to search the vehicle), was abrogated by *Rodriguez*, noting that *Boyce* distinguished *Purcell*, where the criminal history check was part of the routine traffic stop investigation and not, as in *Boyce*, conducted after the traffic  stop  investigation  was  completed.      [*Id.*  at  4-5  (citing  *Boyce*, 351 F.3d at 1107)].  It also contends that *Campbell*, where the Eleventh Circuit held

unlawful unrelated inquiries into drugs and contraband that prolonged the traffic stop, did not discuss either *Boyce* or *Purcell*, and therefore those cases are still good law. [*Id.* at 5].[11]  The Government also posits that five other circuit courts of appeal have found that criminal history checks do not offend *Rodriguez*.  [*Id.* at 6-7 (citing *United States v. Cone*, 868 F.3d 1150, 1153-54 (10th Cir. 2017); *United States v. Fuehrer*, 844 F.3d 767, 772 (8th Cir. 2016); *United States v. Palmer*, 820 F.3d 640, 651 (4th Cir. 2016); *United States v. Sanford*, 806 F.3d 954, 956 (7th Cir. 2015); *United States v. Frierson*, 611 Fed. Appx. 82, 85 (3d Cir. June 2, 2015))].

It also argues that it does not matter that Dougherty did not mention officer safety as a reason for checking McIntosh's criminal history because he testified that he uses ISIS to check to see if there are outstanding warrants for his safety. [*Id.* at 7 (citing T1:106-07)].  It also contends that it is not possible to conduct a query on ISIS that returns only driver's license information or registration, and contends that the automatic inclusion of all of the separate tabbed topics reflects

---

[11]    The Government also suggests that *United States v. Triana*, 760 Fed. Appx. 768, 771 (11th Cir. Jan. 14, 2019), likewise means that *Purcell* and *Boyce* remain good law, [Doc. 53 at 6], but *Triana* was based on the encounter being consensual, and not on a discussion of whether a criminal history check during a traffic stop comports with *Rodriguez*.

the interest of officer safety, an interest recognized in *Rodriguez*.  [*Id.* at 7 (citing *Rodriguez*, 135 S. Ct. at 1616)].

Finally, the Government argues that the short duration encompassed by Dougherty's review of the ISIS and OMNIXX tabs for criminal history demonstrate that he acted diligently in conducting his investigation.  [*Id.* at 8-9].

### B.    ANALYSIS

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures.   U.S. Const. amend. IV.  "In most circumstances, for a search that is not based on consent to comply with the Fourth Amendment, law enforcement must obtain a warrant supported by probable cause."  *United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir. 2005).  Evidence obtained in violation of the Fourth Amendment must be suppressed.  *United States v. Gilbert*, 942 F.2d 1537, 1541 (11th Cir. 1991). Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (citing *United States v. Impson,* 482 F.2d 197 (5th Cir. 1973)); *see also United States v. Knight*, 336 Fed. Appx. 900, 904 (11th Cir. July 8, 2009).   Thus, the Government must demonstrate that the challenged action falls within one of the recognized exceptions

20

to the warrant requirement, thereby rendering it reasonable within the meaning of the Fourth Amendment. *Vale v. Louisiana*, 399 U.S. 30, 34 (1969); *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *Freire*, *supra*.

A so-called "*Terry* stop" is one such narrow exception. *See Terry v. Ohio*, 392 U.S. 1 (1968). *Terry*, and the cases which have followed it, make clear that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000); *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000). Under *Terry*, police officers may make an investigative stop if the circumstances are sufficient to enable them reasonably to suspect that an individual is engaged in criminal activity. *United States v. Cortez*, 449 U.S. 411, 417-22 (1981); *Terry*, 392 U.S. at 21. Probable cause is not required to justify an investigative stop; reasonable suspicion is sufficient. *United States v. Powell*, 222 F.3d 913, 917-18 (11th Cir. 2000); *United States v. Mikell*, 102 F.3d 470, 474-75 (11th Cir. 1996). Specifically, "officers need only 'reasonable suspicion'—that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." *Heien v. North Carolina*, 574 U.S. 54, __, 135 S. Ct. 530, 536 (2014) (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014) (internal quotation marks omitted)); *see also*

*United States v. Dipirro*, 649 Fed. Appx. 930, 931 n.1 (11th Cir. May 18, 2016) ("Though Defendant only references probable cause, we note that a traffic stop is 'constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with' *Terry* [ ].") (quoting *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008)) (citation omitted).

"Reasonable suspicion consists of 'a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable.' " *United States v. Yuknavich*, 419 F.3d 1302, 1311 (11th Cir. 2005) (quoting *United States v. Knights*, 534 U.S. 112, 121 (2001)). "The reasonable suspicion standard requires less than probable cause and 'considerably less' than a preponderance of the evidence." *Navarette*, 572 U.S. at 397 (quotation omitted); *United States v. Mendoza*, 658 Fed. Appx. 479, 482 (11th Cir. Aug. 9, 2016). To make a showing that in fact the officers had reasonable suspicion, they "must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" of criminal activity.' " *Wardlow*, 528 U.S. at 123-24 (quoting *Terry*, 392 U.S. at 27). Thus, the "detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 449 U.S. at 417-18. That is, the

22

officers or agents involved in the challenged law enforcement activity must "articulate some minimal, objective justification" for an investigatory stop. *United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989), and *United States v. Williams*, 876 F.2d 1521, 1524 (11th Cir. 1989)); *see also Yuknavich*, 419 F.3d at 1311 ("It is clear that an inchoate and unparticularized suspicion or hunch of criminal activity is not enough to satisfy the minimum level of objectivity required.") (citing *United States v. Perkins*, 348 F.3d 965, 970 (11th Cir. 2003)).  "The officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* (internal citations and quotations omitted). To determine whether reasonable suspicion exists, courts evaluate the totality of the circumstances from the viewpoint of a reasonably well-trained officer, *United States v. Smith*, 201 F.3d 1317, 1323 (11th Cir. 2000), taking into account the fact that an experienced officer can infer criminal activity from conduct that may seem innocuous to lay observers. *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002); *United States v. Matchett*, 802 F.3d 1185, 1191 (11th Cir. 2015) (noting that courts view the totality of the circumstances in the light of the officer's special training and experience because "behavior, seemingly innocuous to the ordinary citizen, may 'appear suspect to one familiar with [criminal] practices' ") (quoting *Smith*,

23

201 F.3d at 1323, and *United States v. Glover*, 957 F.2d 1004, 1010 (2d Cir. 1992))

(punctuation altered); *see also United States v. Gonzalez*, 70 F.3d 1236, 1238

(11th Cir. 1995) (recognizing that facts giving rise to reasonable suspicion "may be

derived from 'various objective observations, information from police reports, if

such are available, and consideration of the modes or patterns of operation of

certain kinds of lawbreakers.' ") (quoting *Williams*, 876 F.2d at 1524, and *Cortez*,

449 U.S. at 418).  Reasonable suspicion should be examined from the standpoint

of the collective knowledge of all officers involved in a stop, *United States v.

Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998), provided the officers maintained at

least a minimal level of communication during their investigation, *United States v.

Burrows*, 566 Fed. Appx. 889, 892 (11th Cir. May 21, 2014); *United States v. Willis*,

759 F.2d 1486, 1494 (11th Cir. 1985).  Moreover, the "officer's motive . . . does not

invalidate what is otherwise 'objectively justifiable behavior under the Fourth

Amendment[.]' "  *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999)

(quoting *Whren v. United States*, 517 U.S. 806, 812 (1996)).

When an officer conducts a traffic stop, which is a limited investigative

detention subject to the parameters of *Terry*, his actions must be "reasonably related

in scope to the circumstances which justified the interference in the first place,"

24

and "the duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop." *Purcell*, 236 F.3d at 1277.

Applying these principles to this case, first, the Court concludes that the officers had at least reasonable suspicion to perform a traffic stop to investigate McIntosh's operating a moped or motorbike without a helmet. Although at the evidentiary hearing and in portions of his brief McIntosh makes attacks on the officers' credibility and the reason and circumstances of the stop, the officers' body cam videos, as well as McIntosh's acknowledgment that he was not wearing a helmet, satisfy the Government's burden. *See* O.C.G.A. § 40-6-352(a) ("No person shall operate or ride as a passenger upon a moped unless he or she is wearing protective headgear which complies with standards established by the commissioner of public safety."). The Court finds that the officers' testimony was credible and supported by the physical evidence.

Additionally, Georgia law requires that every person operating a motor vehicle, including a moped, must be licensed, have the license in his immediate possession at all times while operating a motor vehicle, and display said license to a law enforcement officer upon demand. O.C.G.A. §§ 40-5-20(a), 40-5-29(a), (b). Accordingly, in the course of the traffic stop, Dougherty was authorized to ask McIntosh for his driver's license, which the record shows without dispute that

25

McIntosh did not possess.[12]  Thus, McIntosh's lack of license allowed Dougherty to extend the stop to determine if he was in fact licensed.

The gist of McIntosh's argument is that Dougherty's investigation was limited at most to resolving the reason for the stop (operating a moped/motorbike with no helmet) and verifying that McIntosh indeed was licensed, and that *Rodriguez* did not allow Dougherty to scroll through the other tabs in the ISIS program, much less the OMNIXX program, to determine if McIntosh was a convicted felon, even if Dougherty was diligent in his efforts and the traffic stop was prolonged even for a *de minimis* amount of time.  The caselaw does not support this argument.

First, the Court concludes that *Rodriguez* itself disposes of McIntosh's argument.  In *Rodriguez*, the Court reiterated that the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention. 135 S. Ct. at 1614.  Thus, an officer may conduct certain unrelated checks during an otherwise lawful traffic stop, "[b]ut . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining

---

[12]     Dougherty could have arrested McIntosh for not being able to produce his license on demand.  *Rojas-Carreno v. Ariemma*, No. 1:08-CV-2839-LTW, 2010  WL 11601219, at *14 (N.D. Ga. Mar. 31, 2010).  Because the Government does not assert this ground, the Court will not base its recommendation upon it.

26

an individual." *Id.* at 1615. The Court also noted, however, that "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop," typically involving "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.*; *see also id.* at 1614 ("Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns[.]") (citations omitted). Therefore, the Court found that the dog sniff at issue in *Rodriguez* was unrelated to the reason for conducting the traffic stop (driving on the highway shoulder) even though it added only eight minutes to the detention after the traffic-stop investigation was completed. In rejecting the Court of Appeals' and the *Rodriguez*' dissent's view that in this case prolonging of the traffic stop by performing a dog sniff was both *de minimis* and permissible for officer safety, the Court distinguished criminal history checks from the dog sniff that occurred in that case:

> Unlike a general interest in criminal enforcement, however, the government's officer safety interest stems from the mission of the stop itself. Traffic stops are "especially fraught with danger to police officers, . . ., so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely. [*Cf.*] *United States v. Holt*,

27

> 264 F.3d 1215, 1221-[22 (10th Cir.] 2001) (en banc)
> (recognizing officer safety justification for criminal record
> and outstanding warrant checks), abrogated on other grounds
> as recognized in *United States v. Stewart*, 473 F.3d 1265, 1269
> [(10th Cir.] 2007).

*Id.* at 1616 (internal citation omitted).[13]  Therefore, *Rodriguez*' citation to *Holt*

suggests that the Court views criminal-history checks, along with license,

registration, and active warrant queries, to be part and parcel of the mission of a

traffic stop consistent with the important governmental interest in officer safety.

While *Rodriguez* warned that undertaking safety precautions in order to facilitate

detours from the mission of the traffic stop are not permitted in the absence of

---

[13]     The portion of the *Holt* decision that the *Rodriguez* Court cited provides:

> [A] motorist expects an officer to take reasonable measures to
> protect officer safety during the stop.  When these measures are
> not too intrusive, the government's strong interest in officer
> safety outweighs the motorist's interests.  Thus, for example, the
> motorist may be detained for a short period while the officer runs
> a background check to see if there are any outstanding warrants
> or criminal history pertaining to the motorist even though the
> purpose of the stop had nothing to do with such prior criminal
> history.  The justification for detaining a motorist to obtain
> criminal history is, in part, officer safety. . . .  By determining
> whether a detained motorist has a criminal record or outstanding
> warrants, an officer will be better apprized of whether the
> detained motorist might engage in violent activity during the stop.

*Holt*, 264 F.3d at 1221 (citing, *inter alia*, *Purcell*, 236 F.3d at 1278 ("The request for criminal histories as part of a routine computer check is justified for officer safety.")

28

additional reasonable suspicion, *id.* at 1616, there is no indication, particularly given the Court's favorable citation to *Holt*, that running a motorist's criminal history is per se a detour from the mission of the traffic stop. And, significantly, as pointed out by the Government, several courts of appeal post-*Rodriguez* have concluded that running criminal-history checks is not separate from the mission of investigating a traffic violation. *Palmer*, 820 F.3d at 651 ("A police officer is entitled to inquire into a motorist's criminal record after initiating a traffic stop."); *Sanford*, 806 F.3d at 956 ("The trooper checked the occupants' criminal history on the computer in his car—a procedure permissible even without reasonable suspicion. . . ."); *Frierson*, 611 Fed. Appx. at 85 ("Upon initially detaining the men, [the officer] reasonably addressed the traffic violation that warranted the stop and attended to safety concerns. For example, any preliminary delay in checking [the driver's] license, registration, and criminal history was justified as part of the stop."). *But see United States v. Clark*, 902 F.3d 404, 411 (3d Cir. 2018) (after confirming that driver was authorized to drive, questioning of passenger went beyond ordinary inquiries of the traffic stop) [14]; *United States v. Evans*,

_____

[14]     The district court opinion in *Clark* illuminates an example of what *Rodriguez* warned against—using officer safety as a detour to investigate other crimes. Although not the rationale of the circuit court opinion, the trial court granted the passenger's suppression motion in part because it found that questioning the driver

786 F.3d 779, 786 (9th Cir. 2015) (holding that "ex-felon registration" check performed after completing vehicle record and warrant checks "was wholly unrelated to [officer]'s 'mission' of 'ensuring that vehicles on the road are operated safely and responsibly'") (citation omitted).

The Court does not read *Rodriguez* as requiring an officer who lawfully is performing computer checks during a traffic stop to limit the inquiry solely to driver's license and warrant queries, expressly where, as here, all of the information is contained in separate tabs that appear contemporaneously and regardless of whether there is any message contained in the separate tabs.  Therefore, the Court concludes that Dougherty's checking McIntosh's criminal history was consistent

_____

about his criminal history, after the officer already discovered his criminal record by performing a records check, was unrelated to the traffic stop's mission. *See United States v. Clark*, Criminal Action No. 16-449 (FLW), 2017 WL 3394326, at *7 (D.N.J. Aug. 7, 2017) ("At the time that Officer Bradley asked about Roberts' past arrests, Officer Bradley was already aware of Roberts' criminal record, including arrests for drug activity, having reviewed Roberts' record through the mobile data terminal. . . .  The purpose of Officer Bradley's questioning therefore could not have been to inquire about the existence of Roberts' criminal record, which was already established, or the presence of outstanding warrants, which had already been ruled out.  Additionally, there has been no suggestion in this case by the Government or any party that Roberts' past arrests were relevant to the motor vehicle infractions for which Roberts was stopped, nor otherwise related to the mission of promoting road and traffic safety. *Rodriguez*, 135 S. Ct. at 1614.  Similarly, the Government has not argued, and there is no evidence to support that Officer Bradley felt threatened in any way such that additional questioning might be justified by the officer's general safety interest. *Id.* at 1616.")

30

with the protections established in *Rodriguez* and comported with the Fourth Amendment.

Furthermore, because the ISIS program did not give a complete enough picture of McIntosh's criminal history because it only showed that he was on some sort of federal supervision, Dougherty's querying of the OMNIXX system in order to view McIntosh's photograph and to obtain a clearer picture of his supervision by pulling his criminal history likewise is consistent with *Rodriguez*. The Court sees nothing in *Rodriguez* that required Dougherty to immediately stop his investigation once he preliminarily discovered that a person was licensed under the same name and date of birth that McIntosh provided. Perhaps if McIntosh had actually had his license in his possession and after Dougherty inspected it and an ISIS computer check confirmed that it was valid, the result would be different, but that scenario is not this case or before the Court.[15]

_____

[15] Since the Court concludes that the officers' actions were consistent with what *Rodriguez* allows, the Court does not have to discuss at length the Government's alterative argument that the officers' good faith reliance on *Purcell* excepts from the exclusionary rule any evidence that the police obtain in searches conducted in objectively reasonable reliance on binding appellate authority pursuant to *Davis v. United States*, 564 U.S. 229, 232 (2011). However, *Rodriguez* was issued in 2015, well before the officers' actions in this case. Either *Purcell* is consistent or inconsistent with *Rodriguez*. The Court happens to conclude that it is consistent, *see infra*, but if the Court is incorrect, the officers could not have in good faith relied upon an earlier Eleventh Circuit case that is inconsistent with an

Second, even if *Rodriguez* does not generally allow criminal history checks during the course of a traffic stop investigation that prolongs the stop, even in a *de minimis* amount of time, Dougherty had reasonable suspicion to extend the investigation in this case.

Reasonable suspicion is "a particularized and objective basis" for suspecting the person stopped of criminal activity. *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). It must be more than a hunch, but "the likelihood of criminal activity need not rise to the level of probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). In evaluating an officer's actions, the Court does not consider each observation in isolation but instead looks to the totality of the circumstances. *United States v. Lopez-Garcia*, 565 F.3d 1306 (11th Cir. 2009). In assessing reasonable suspicion, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Terry*, 392 U.S. at 21-22 (citation and internal marks omitted); *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008)

_____

intervening Supreme Court decision.

("[T]he issue is not whether the particular officer involved actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify the investigatory stop.") (citation and internal marks omitted); *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006) ("[W]hether reasonable suspicion existed at the time of the investigatory stop is a question of law to be determined ultimately by judges, not policemen. . . . [T]he question . . . is not whether a specific arresting officer . . . actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify such a search.") (citation and internal marks omitted).  Thus, an officer may extend the stop beyond the traffic stop's mission if he or she develops independent reasonable suspicion of other criminal activity.  *United States v. Hernandez*, 418 F.3d 1206, 1209 (11th Cir. 2005).  In other words, "to unlawfully prolong, the officer must (1) conduct an unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) without reasonable suspicion."  *United States v. Campbell*, 912 F.3d 1340, 1353 (11th Cir. 2019).

Under the facts of this case, Dougherty was authorized as part of the traffic stop in this case to determine whether McIntosh had a criminal history.  Because McIntosh was not carrying his driver's license as required, Dougherty needed to

33

take extra steps to determine that the name and date of birth that McIntosh provided him was in fact his personal identifying information and that he was in fact licensed. Although the information that McIntosh provided turned out to be the same as the information on file for McIntosh's driver's license in the ISIS database, it was more than reasonable for Dougherty to engage in the extra steps—including checking on the other tabs in ISIS—in an attempt to confirm that McIntosh was who he stated he was, was in fact a licensed driver, and had no open warrants. Once Dougherty obtained a federal supervision hit, considering McIntosh's possession of the firearm and his agitated demeanor, Dougherty had reasonable suspicion to investigate further. The fact that McIntosh was on active supervision at the time distinguishes this case from *Evans*, where the officer was simply performing a historical criminal history check after he completed the traffic investigation. Then, Dougherty properly accessed the OMNIXX system to obtain McIntosh's photograph and a more detailed criminal history that confirmed that the person they detained was McIntosh and that he was on federal supervision for a felony, thus making the possession of the firearm unlawful under Georgia law.

Finally, although the Supreme Court's silence about a case not before it is of no precedental value, the Court concludes that *Purcell* remains good law in light of *Rodriguez* and is not inconsistent with *Campbell*. In *Purcell*, the Eleventh Circuit

34

held that the "request for criminal histories as part of a routine computer check is justified for officer safety.  It is both reasonable and minimally intrusive. Indeed, in most cases, the occupants of the car will not even know what information has been requested as part of the computer check.  The inclusion of such a request in an otherwise valid computer check does not render it unconstitutional." *Purcell*, 236 F.3d at 1278.  As noted above, *supra* at 27-28, the *Rodriguez* Court favorably cited *Holt*, which in turn relied in part on *Purcell*'s reasoning.  Therefore, any *de minimis* delay in the stop due to the need to check criminal history is not unconstitutional.  Particularly in this case where Dougherty received a federal supervision hit while at the same time trying to confirm that the person stopped was in fact McIntosh, the minimal delay was not only reasonable but, given McIntosh's attitude and possession of the firearm, prudent.

*Campbell* also does not undermine *Purcell*.  As the Eleventh Circuit subsequently described that case,

> In *Campbell*, we applied *Rodriguez* to hold that a traffic stop was unlawful because it had been prolonged for 25 seconds by an officer's efforts to uncover evidence of general criminal activity unrelated to the purpose of the stop.  [912 F.3d] at 1354-55. There, an officer pulled over a vehicle after witnessing two potential traffic violations and began issuing a written warning. *Id.* at 1344-45. As the officer filled out the warning, he asked the driver whether he had any contraband in his vehicle, such as counterfeit merchandise, illegal alcohol, drugs, or any dead bodies. *Id.* at 1345. The driver said that he did not and gave the

35

officer permission to search his vehicle, and the officer found a firearm and ski mask. *Id.* The driver sought suppression of that evidence on the basis that the officer unlawfully prolonged the stop by asking questions designed to investigate general criminal activity. *Id.* On appeal, we agreed that the stop was unlawful under *Rodriguez* because it had been prolonged by the officer's questions about the contraband, which were unrelated to the purpose of the traffic stop. *Id.* at 1354-55.

*United States v. Burwell*, 763 Fed. Appx. 840, 852 (11th Cir. Feb. 27, 2019). Thus, *Campbell* does not undermine *Purcell*'s rationale that criminal-history checks in the course of routine computer inquiries during traffic stops are legitimate and relatively non-burdensome actions that promotes the important interest of officer safety.

The question remains whether Dougherty acted diligently. The record shows that within nine minutes of the initial stop, Dougherty learned that McIntosh was a convicted felon. At the same time, the record appears to reflect that Dougherty stalled for time in between the ISIS results and his inputting of information into the OMNIXX system in order to give Hansen additional time to arrive on the scene. The Court concludes that any such delay does not render Dougherty's actions unconstitutional, considering the steps that Dougherty had to perform to log onto the OMNIXX system (minimize ISIS, obtain McIntosh's FBI or GCIC number, and log into OMNIXX) that he was undertaking either contemporaneously to or immediately following being advised that Hansen was nine to ten minutes away.

36

To the extent that Dougherty's actions actually caused a delay, his actions were reasonable given McIntosh's agitated state, that he was on federal supervision for some offense, and he possessed a firearm. *United States v. Lester*, 477 Fed. Appx. 697, 701 (11th Cir. June 17, 2012) (noting that the only delay in the investigation was the five to ten minutes that it took for backup to arrive, and noting that the wait was reasonable to ensure officer safety) (citing *Michigan v. Long*, 463 U.S. 1032, 1052 (1983) ("[W]e have not required that officers adopt alternate means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter."); *see also Long*, 463 U.S. at 1047 (holding that, in the context of a *Terry* stop, "[w]hen the officer has a reasonable belief that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm") (internal quotations omitted); *United States v. Portillo-Saravia*, 379 F. Supp. 3d 600, 614 (S.D. Tex. 2019) (holding that prompt call for backup, which arrived roughly seven minutes later, was constitutionally tolerable because it was a "negligibly burdensome precaution" related to the mission of the traffic stop) (citing *Rodriguez*, 135 S. Ct. at 1616).  Especially in light of the Supreme

37

Court's warning that a court should not "indulge in unrealistic second-guessing" as to the means law enforcement officers employ to conduct their investigations, the Court finds Dougherty's investigative actions to be reasonable under the circumstances. *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

Accordingly, for all of the above and foregoing reasons, the undersigned **RECOMMENDS** that McIntosh's motion to suppress evidence, [Doc. 17], be **DENIED**.

## III. <u>CONCLUSION</u>

In conclusion, for all of the above and foregoing reasons, the undersigned **RECOMMENDS** that McIntosh's motion to dismiss the superseding indictment, [Doc. 56], and motion to suppress evidence, [Doc. 17],be **DENIED** and that his motion to suppress statements, [Doc. 18], be **DENIED AS MOOT WITHOUT PREJUDICE**.

The undersigned has now ruled upon all matters referred pursuant to Standing Order 14-02 (N.D. Ga. Aug. 15, 2014). The Court has not been advised of any impediments to the scheduling of the trial as to this defendant. Therefore, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED, ORDERED and CERTIFIED**, this

13th day of __October__, 2019.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

39