# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

United States of America,

v.                                    Case No. 1:18-cr-00431

Jasper McIntosh,                      Michael L. Brown
                                      United States District Judge
            Defendant.

_____/

## ORDER

Magistrate Judge Alan J. Baverman recommends denial of Defendant Jasper McIntosh's motions to suppress evidence (Dkt. 17) and statements (Dkt. 18), and to dismiss the superseding indictment (Dkt. 56). (Dkt. 60.) Defendant McIntosh objects to that recommendation. (Dkt. 70.) The Court accepts the Magistrate Judge's recommendation and denies Defendant McIntosh's motions.

## I.    Background

The United States charged Defendant McIntosh in Count One of the First Superseding Indictment with illegally possessing a firearm in violation of Sections 922(g)(1) and 924(e) of Title 18 of the United States Code. (Dkt. 46 at 1–2.)

The facts for purposes of Defendant McIntosh's motions are as follows. Atlanta Police Department ("APD") Officers James Dougherty and Anthony Grant were patrolling in a marked APD vehicle on the evening of September 23, 2018, when they observed McIntosh riding a small motorbike on Metropolitan Parkway.[1]  (Dkt. 26 at 8:3–17.) McIntosh was not wearing a helmet, and his motorbike had no lights on. (*Id.* at 8.)  Both officers were wearing body cameras.  (Dkt. 24, Defendant's Exhibits 1–2.)  The officers followed McIntosh from Metropolitan Parkway to Cleveland Avenue and then to Forest Hills Drive, where they initiated a traffic stop because McIntosh was not wearing a helmet.  (Dkt. 26 at 9:15–10:13, 150:17–23.)

The officers turned on their blue lights and siren.  (*Id.* at 10:14–16, 113:9–12.)  McIntosh was in the lane of traffic.[2]  (*Id.* at 112:1–113:10, 134, 146:15–25.)  At first, McIntosh yelled at the officers and motioned for

---

[1] McIntosh disputes the officers' account of where they first observed him, how long they followed him before initiating the traffic stop, and whether they saw him turn from Cleveland Avenue onto Forest Hills Drive.  (Dkts. 50 at 2–3; 70 at 5–6, 8–10.)  These discrepancies do not affect the Court's decision.

[2] McIntosh asserts that he was "traveling off the *shoulder* of Forest Park Drive heading south" when the officers came upon him and activated their blue lights.  (Dkt. 70 at 11.)

them to move around him. (*Id*. at 10:15–21, 113:9–21.) After the officers told him to pull over several times, McIntosh turned from the middle of the right-hand lane of traffic on Forest Hills Drive into a driveway on the left and turned around, facing the police car's driver's door. (*Id*. at 10:15–21, 58–59, 113:9–21, 148:18–25.) He appeared agitated. (*Id*. at 10:22–23.) The officers told him to get out of the roadway and to pull into the driveway on the left, which he did. (*Id*. at 150, 151.)

The counter on the recording from Officer Dougherty's body camera shows the officers stopped and encountered McIntosh one minute and forty-one seconds into the video. (Dkt. 24, Defendant's Exhibit 2.) Forty-nine seconds into the traffic stop Dougherty asked McIntosh why he was not wearing a helmet, and McIntosh replied that he had gone to get gas and lived nearby. (*Id*.) One minute and ten seconds into the stop, Dougherty asked McIntosh for his driver's license, and McIntosh said it was at home. (*Id*.) Dougherty asked for McIntosh's name and date of birth, and McIntosh complied. (*Id*.) Officers Dougherty and Grant told McIntosh to step away from the motorbike, and he did. (*Id*.; Dkt. 26 at 12:17–13:2.) Dougherty noticed that McIntosh had a holster with a firearm. (Dkts. 24, Defendant's Exhibit 2, Government's Exhibits 4A–D;

26 at 13:5–6.)  But the firearm did not make Dougherty suspicious that McIntosh was doing anything illegal, because it is legal to carry a firearm in Georgia.  (Dkt. 26 at 63:24–64:8.)  When McIntosh asked whether he was being arrested or detained, Dougherty responded that McIntosh was being detained for not wearing a helmet.  (Dkts. 24, Defendant's Exhibit 2; 26 at 66:9–67:9.)

Three minutes and forty seconds into the traffic stop, Dougherty returned to his police vehicle to check whether McIntosh had a valid driver's license in the ISIS program on the Mobile Data Terminal.  (Dkt. 26 at 14:12–16.)  Dougherty testified that the ISIS program is a "reporting program" that can run vehicle registrations and driver's license files and provide limited information about wants, warrants, probation, and parole "hits."  (*Id.* at 14:19–24.)  Dougherty utilized the ISIS system first for convenience and safety, because he was already logged into the program and could quickly check for warrants and learn if a person is wanted for a crime.  (*Id.* at 106:11–107:2.)[3]  Therefore,

---

[3] McIntosh objects to the Magistrate Judge's factual finding that Dougherty checks criminal histories on every traffic stop.  (Dkt. 70 at 12 (quoting Dkt. 60 at 8).)  The Court finds that Dougherty testified that he

instead of logging out of ISIS after getting the driver's license information and going to another system (OMNIXX) to view McIntosh's license photograph, Dougherty clicked on all of the ISIS tabs. (*Id*. at 16:25–17:5, 78:18–81:5; *see also* Dkt. 24, Defendant's Exhibit 2 at 5:55–6:48.) The system registered a hit for "federal probation/supervised parole." (*Id*.) This occurred four minutes and forty-nine seconds after the officers stopped McIntosh. (Dkt. 24, Defendant's Exhibit 2.) That hit led Dougherty to believe McIntosh was on federal supervision, although he did not know the underlying offense or whether it was a felony. (*Id*.) About nine seconds later, as a precaution, Dougherty called for backup because McIntosh was a large man, had a firearm, and was agitated. (Dkts. 24, Defendant's Exhibit 2 at 6:36–7:26; 26 at 16:25–17:5, 82:9–83:11, 104:22–105:7.) He also decided to investigate further because of the firearm McIntosh was carrying and the federal probation hit. (Dkt. 26 at 82:22–83:14.)

Six minutes and twenty-five seconds after stopping McIntosh, Dougherty accessed the OMNIXX program, another online database that

---

needs to check the messages on ISIS relating to whether there are warrants in every traffic stop. (Dkt. 26 at 99:13–18.)

allows him to obtain a photograph of the person and run a criminal history. (*Id.* at 17:6–23, 83:15–84:10; *see also* Dkt. 24, Defendant's Exhibit 2 at 7:45–8:10.) Although ISIS and OMNIXX contain some of the same information, he could get more information and perform additional searches in OMNIXX. (Dkt. 26 at 17:18–23.) To do this, he had to minimize the ISIS platform, access the internet, and log onto the OMNIXX system. (*Id.* at 18:7–17; *see also* Dkt. 24, Defendant's Exhibit 2 at 7:25-7:55.) He did. (Dkt. 24, Defendant's Exhibit 2 at 7:55–8:10.) He then entered the information McIntosh gave him to pull up a driver's license photo. (*Id.* at 19:1–4.)

The OMNIXX program produces a series of messages with information about driver's licenses, warrants, and supervision. They appear at the same time, but (as in ISIS) a user has to click on each individual message. (*Id.* 84:20–85:15; *see also* Dkt. 24, Defendant's Exhibit 2 at 8:54–9:39.) Seven minutes and forty-nine seconds after stopping McIntosh, Dougherty accessed McIntosh's driver's license photo (confirming that this was the same person that the officers had encountered) and he also obtained the same supervised federal parole/probation hit on the same name and date of birth that McIntosh

had previously given him.  (Dkts. 24, Defendant's Exhibit 2 at 8:59–9:19; 26 at 19–20, 21, 80, 86.)

APD Officer Hansen, who had responded to Dougherty's request for backup, reported that he was nine to ten minutes away and Dougherty replied, "[a]lright, we'll be here."  (Dkts. 24, Defendant's Exhibit 2 at 9:25–9:35; 26 at 24:2–11.)  When McIntosh asked Dougherty what was going on, Dougherty lied and said he was trying to verify who McIntosh was because he was not carrying his driver's license.  (Dkts. 24, Defendant's Exhibit 2 at 11:20–11:29; 26 at 94:6–25.)  Dougherty testified he was delaying McIntosh with this lie until backup arrived.  (Dkt. 26 at 93:11–14.)  Dougherty also ran McIntosh's criminal history (after he researched and obtained his FBI or Georgia criminal history index number), receiving that report at approximately 7:53 p.m.  (Dkts. 24, Defendant's Exhibit 2 at 9:39–13:00; 26 at 26:19–27:9, 89:17–90:16, 96:2–97:22.)  With this, he discovered McIntosh was a convicted felon.  (Dkt. 26 at 27:15–24, 96:2–11.)  Approximately three minutes had elapsed since he initially received notification of a probation hit.  (*Id*. at 90:9–17.)  Slightly less than twelve minutes had elapsed since the initial stop.  (*Id*. at 96.)  Dougherty decided to arrest McIntosh for being a felon in

possession of a firearm. (*Id.* at 98.) Those initial twelve minutes, therefore, are the only ones relevant to the determination of whether the traffic stop was reasonable.

Ultimately, due to further delay on backup's arrival and the arrival of a civilian vehicle (towards which McIntosh started to approach and Dougherty told Grant to not let McIntosh approach), Dougherty decided to place McIntosh under arrest. (*Id.* at 100:5–12, 105:8–18.) McIntosh resisted, struggled with Dougherty and Grant, and fled before Dougherty caught up and tased him twice. (*Id.* at 100:5–101:15; *see also* Dkt. 24, Defendant's Exhibit 2 starting at 14:15.) Officer Hanson, who arrived as backup, tased McIntosh a third time. Dougherty grabbed the firearm from the holster on McIntosh's waist and threw it into some brush.

McIntosh was charged with several offenses, including possession of a firearm by a convicted felon, not wearing a helmet, and misdemeanor obstruction of an officer. (Dkt. 26 at 33:3–12.)

## II.    Legal Standard

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation ("R&R").    28 U.S.C.

§ 636(b)(1); FED. R. CRIM. P. 59; *Williams v. Wainwright*, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam). A district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). The district judge should "give fresh consideration to those issues to which specific objection has been made by a party." *Jeffrey S. v. State Bd. of Educ. of Ga.*, 896 F.2d 507, 512 (11th Cir. 1990) (citation omitted). For those findings and recommendations to which a party has not asserted objections, the court must conduct a plain error review of the record. *See United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983).

Parties filing objections to a magistrate judge's R&R must specifically identify those findings to which they object. *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988). "Frivolous, conclusive, or general objections need not be considered by the district court." *Id.*

McIntosh both generally relies on the arguments he set out in his Response in Support of his Motion to Suppress Evidence (Dkt. 50) and specifically objects to some findings in the Magistrate Judge's R&R. The Court thus conducts a plain error review of the portions of the R&R to which neither party offers specific objections and a de novo review of the

Magistrate Judge's findings to which Defendant McIntosh specifically objects. *See Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1373 (N.D. Ga. 2006) ("[I]ssues upon which no specific objections are raised do not so require de novo review; the district court may therefore 'accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge[,]' applying a clearly erroneous standard." (quoting 28 U.S.C. § 636(b)(1))).

## III.  Discussion

### A.    Motion to Dismiss Indictment

Defendant argues the Court should dismiss the superseding indictment because § 922(g) is unconstitutional as applied to him.  He says the statute exceeds Congress's statutory authority under the Commerce Clause since his alleged possession of the firearm did not substantially affect interstate commerce.  (Dkt. 56.)

The Magistrate Judge recommends denial of McIntosh's motion based, in part, on binding Eleventh Circuit precedent.  (Dkt. 60 at 1 (discussing *United States v. McAllister*, 77 F.3d 387 (11th Cir. 1996)).) The Magistrate Judge further noted that courts are limited to reviewing the face of an indictment and cannot consider possible evidence that may

be presented at trial when ruling on a motion to dismiss. (*Id*. at 1–2.) This Court agrees.

The Eleventh Circuit "ha[s] repeatedly held that Section 922(g)(1) is not a facially unconstitutional exercise of Congress's power under the Commerce Clause because it contains an express jurisdictional requirement." *See United States v. Jordan*, 635 F.3d 1181, 1189 (11th Cir. 2011) (citing *United States v. Scott,* 263 F.3d 1270, 1273 (11th Cir. 2001) (per curiam)). "The jurisdictional requirement is satisfied when the firearm in question has a 'minimal nexus' to interstate commerce." *Id.* The Eleventh Circuit has "also held that Section 922(g)(1) was not unconstitutional as applied to a defendant who possessed a firearm only intrastate because the government demonstrated that the firearm in question 'had travelled in interstate commerce.'" *Id*. (quoting *McAllister,* 77 F.3d at 390 and *United States v. Dupree,* 258 F.3d 1258, 1260 (11th Cir. 2001)). This Court is bound by Eleventh Circuit precedent. *See In re Hubbard*, 803 F.3d 1298, 1309 (11th Cir. 2015).

In his objections to the R&R, McIntosh argues that the Eleventh Circuit has misinterpreted Supreme Court precedent and that the Commerce Clause is not so broad. He argues that § 922(g) is a criminal

statute that has nothing to do with commerce or any economic enterprise. (Dkt. 70 at 3–4 (citing *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000)).)  The Eleventh Circuit expressly rejected this argument in *McAllister*, stating

> when viewed in the aggregate, a law prohibiting the possession of a gun by a felon stems the flow of guns in interstate commerce to criminals. Nothing in [*United States v. Lopez*] suggests that the 'minimal nexus' test should be changed.

77 F.3d at 390; *see also Gonzales v. Raich*, 545 U.S. 1, 26 (2005) ("Prohibiting the intrastate possession or manufacture of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product."); *Dupree*, 258 F.3d at 1259 (quoting *McAllister* and explaining "[i]t is this jurisdictional element to § 922(g) that distinguishes it from the Gun Free Schools Act and, accordingly, the holding in *Lopez*").

Here, as the Magistrate Judge noted, the evidence indicates the firearm McIntosh allegedly possessed was manufactured in Connecticut, which is outside of Georgia, the state in which the offense took place.  (*See* Dkts. 56 at 18–19; 60 at 2.)  Because the firearm McIntosh possessed previously had travelled in interstate commerce, the statute would not

be unconstitutional as applied to him. *See United States v. Wright*, 607 F.3d 708, 716 (11th Cir. 2010). And, of course, the superseding indictment alleges that the firearm affected interstate and foreign commerce. (Dkt. 46 at 2.) The Court denies Defendant McIntosh's motion to dismiss the first superseding indictment.

## B. Motion to Suppress Evidence

Defendant McIntosh moved to suppress evidence, specifically the firearm, seized during the traffic stop. (Dkt. 17.) He argued that the officers' investigation and delay were unrelated to the purpose of the traffic stop and thus violated the Fourth Amendment.

After holding an evidentiary hearing on McIntosh's motions to suppress evidence and statements, the Magistrate Judge recommended denial of McIntosh's motion to suppress evidence. In his objections, McIntosh specifically challenges the Magistrate Judge's findings that (1) there was no independent criminal investigation of McIntosh unrelated to the purpose of the traffic stop; (2) the stop was not unconstitutionally prolonged due to the criminal investigation; (3) an investigation into a motorist's criminal history is per se constitutional as part of a routine traffic stop when there is no basis for the search;

(4) officer diligence and overall reasonableness are the standards to evaluate the traffic stop under the Fourth Amendment; and (5) they are inconsistent with *Rodriguez v. United States*, 575 U.S. 348 (2015), and *United States v. Campbell*, 912 F.3d 1340 (11th Cir. 2019).

The Fourth Amendment protects the public from "unreasonable searches and seizures." U.S. CONST. amend. IV. When police stop a motor vehicle, even for a brief period, a Fourth Amendment "seizure" occurs. *See Whren v. United States*, 517 U.S. 806, 809–10 (1996). "A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez*, 575 U.S. at 354. But "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Id.* (internal citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*

This is not to say that police officers must single-mindedly pursue the traffic violation that caused the stop. *See Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into

something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."). "In particular, an officer may prolong a traffic stop to investigate the driver's license and the vehicle registration, including by requesting a computer check, or while waiting for the results of a criminal history check that is part of the officer's routine traffic investigation." *United States v. Holt*, 777 F.3d 1234, 1256 (11th Cir. 2015). While a police officer "may conduct certain unrelated checks during an otherwise lawful traffic stop . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 575 U.S. at 355. To unlawfully prolong a traffic stop, "the officer must (1) conduct an unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) without reasonable suspicion." *Campbell*, 912 F.3d at 1353. "If a stop is unlawfully prolonged without reasonable suspicion in violation of the Fourth Amendment, any evidence obtained as a result of that constitutional violation must generally be suppressed." *United States v. Anguiano*, No. 18-10482, 2019 WL 5681173, at *5–6 (11th Cir. Nov. 1, 2019) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)).

The Magistrate Judge found that Officers Dougherty and Grant had at least reasonable suspicion to perform a traffic stop to investigate McIntosh operating a moped or motorbike without a helmet. The Magistrate Judge also found that McIntosh's lack of a license allowed Dougherty to extend the stop to determine if McIntosh, in fact, had a license. This Court agrees. Georgia law requires everyone operating a moped to wear protective headgear that complies with standards established by the commission of public safety. GA. CODE ANN. § 40-6-352. Georgia law also states that everyone operating a motor vehicle, which is defined to include a moped, must have a license to operate the motor vehicle, must have it in their possession when operating the motor vehicle, and must present it to law enforcement upon demand. GA. CODE ANN. §§ 40-5-20(a), 40-5-29, 40-1-1(33).

The officers saw McIntosh driving what appeared to be a moped without a helmet. Their initial decision to stop him was reasonable based on their belief he had violated Georgia law. *See Wren*, 517 U.S. at 809 (explaining that a police officer's initial decision to stop a motor vehicle "is reasonable where the police have probable cause to believe that a traffic violation has occurred"). Then, when he failed to produce his

license, they had additional reason to believe he had violated Georgia law.

McIntosh argues the United States failed to establish his motorized bike as a "moped" under the statute, the "protective headgear" he was wearing — "a knit cap, eye protection (glasses), and face protection" — did not comply with the standards the commission of public safety established, and that no one has specified what those safety standards were. (Dkt. 70 at 18–19.) Despite McIntosh's arguments, the Court finds that the officers had the necessary "reasonable suspicion" for suspecting McIntosh was violated section 40-6-352(a). *See Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (holding that to justify the "seizure" that occurs during a traffic stop, "officers need only 'reasonable suspicion'—that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law" (quoting *Prado Navarette v. California*, 572 U.S. 393, 396 (2014))). Dougherty testified that it was his understanding that the law requires a person to wear a helmet if he is driving a moped. (Dkt. 26 at 33:13–15.) McIntosh does not dispute that he was not wearing a helmet. Even if the officers were mistaken about whether McIntosh's motorbike was a "moped," the officers' decision to stop McIntosh was still

reasonable. *See Heien*, 574 U.S. at 63 (holding that probable cause "encompasse[s] suspicion based on reasonable mistakes of both fact and law").

The critical question is whether Dougherty impermissibly prolonged the stop by opening the tabs in the ISIS program and by conducting his search of McIntosh's criminal history after confirming McIntosh's identity in the OMNIXX system. McIntosh argued that the traffic stop was impermissibly extended beyond its proper duration because Dougherty conducted "an independent investigation into McIntosh's criminal history," rather than confirm his identity in OMNIXX and complete the purpose of the stop. (Dkt. 70 at 14–16.)

The Magistrate Judge considered *Rodriguez*, *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001), and other relevant case law and found that Dougherty's decision to check McIntosh's criminal history was consistent with the protections established in *Rodriguez* and comported with the Fourth Amendment. He further found that Dougherty's decision to query the OMNIXX system to view McIntosh's photograph and access his criminal history to better understand the circumstances of his supervision was consistent with *Rodriguez* because

the ISIS program only showed that McIntosh was under some sort of federal supervision.

The Magistrate Judge further found that Dougherty had reasonable suspicion to extend the investigation. Because McIntosh was not carrying any identification or a driver's license, Dougherty needed to take extra steps to verify that the name and birth date he provided were correct and that he was properly licensed to drive the moped. It was reasonable for Dougherty to check the other tabs in the ISIS system to confirm McIntosh's identity, that he was a licensed driver, and had no open warrants. The Magistrate Judge reasoned that the federal supervision hit combined with McIntosh's possession of a firearm and agitated demeanor gave Dougherty reasonable suspicion to investigate further. The Court agrees.

The officers also had the right to check McIntosh's criminal history during the stop, which included discovery in ISIS that McIntosh was on supervised release and in OMNIXX that he is a convicted felon. *See Purcell*, 236 F.3d at 1278 ("The request for criminal histories as part of a routine computer check [during a traffic stop] is justified for officer safety."). The Magistrate Judge analyzed the Supreme Court's decision

in *Rodriguez* and correctly noted that, "an officer may conduct certain unrelated checks during an otherwise lawful traffic stop, '[b]ut . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.' " (Dkt. 60 at 26–27 (quoting *Rodriguez*, 575 U.S. at 355).)  The Magistrate Judge found that Dougherty's checking McIntosh's criminal history and querying the OMNIXX system to view McIntosh's photograph and obtain a clearer picture of his supervision did not prolong the traffic stop, comported with the Fourth Amendment, and was consistent with the protections established in *Rodriguez*.  (*Id*. at 30–31, 33–35.)  The Court adopts the Magistrate Judge's analysis and reasoning.

McIntosh objects to the Magistrate Judge's finding that there was no independent criminal investigation unrelated to the purpose of the traffic stop.  (Dkt. 70 at 7.)  This objection lacks merit for the reasons the Magistrate Judge stated in his report and recommendation and that the Court discussed above.  Dougherty's decision to check the various tabs in ISIS was an "ordinary inquir[y] incident to the traffic stop" performed before the tasks tied to the traffic infraction were completed.  *See Campbell*, 912 F.3d at 1351 ("[R]elated tasks are the ordinary inquiries

incident to a traffic stop." (internal quotation marks omitted)).  His decision to then confirm McIntosh's identity and the basis for his supervision in OMNIXX was the same.  It did not prolong the time necessary to investigate the traffic offense as it was all part of Dougherty's effort to confirm Mcintosh's identify.  Perhaps he prolonged the stop for the moments it took him to call for backup after seeing McIntosh might be on supervised release.  But, by then, the information he received in ISIS combined with the firearm McIntosh carried gave Dougherty reasonable suspicion of criminal activity necessary to prolong slightly the duration of the stop.  But, the evidence shows there really was no delay as Dougherty called for backup while still trying to confirm McIntosh's identity in OMNIXX.

McIntosh also objects to the Magistrate Judge's finding that the stop was not unconstitutionally prolonged.  (Dkt. 70 at 7.)  In *Campbell*, the Eleventh Circuit stated that to unlawfully prolong a traffic stop, "the officer must (1) conduct an unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) without reasonable suspicion."  912 F.3d at 1353.  The Eleventh Circuit has also held that, "out of interest for the officer's safety, officers may permissibly prolong a

detention while waiting for the results of a criminal history check that is part of the officer's routine traffic investigation." *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003); *see also Purcell*, 236 F.3d at 1277–78. Eleventh Circuit precedent supports the lawfulness of Dougherty's actions. He did not conduct an inquiry unrelated to the traffic stop. He simply tried to confirm McIntosh's identify and criminal history. Having done that, he had sufficient reasonable suspicion to extend the investigation to further confirm McIntosh's criminal history. Only a little under twelve minutes elapsed from the time the officers pulled McIntosh over to the time Dougherty obtained McIntosh's criminal history report, discovered McIntosh was a convicted felon, and decided to arrest him. The Eleventh Circuit has approved traffic stops of much longer duration, particularly when (as here) the officer acted expeditiously. *Cf. Purcell*, 236 F.3d at 1279 ("Fourteen minutes in not an unreasonable amount of time for a traffic stop."); *see also United States v. Ramos*, No. 2:16-CR-431-WKW, 2017 WL 26905, at *3 (M.D. Ala. Jan. 3, 2017) (finding traffic stop not unlawfully prolonged where trooper obtained information contributing to his suspicion within twelve minutes of beginning the stop).

Having considered all of the evidence in the record, the Magistrate Judge's R&R, and McIntosh's briefs in support of his motions and objections, the Court overrules McIntosh's objections and denies his motion to suppress.

## C.     Motion to Suppress Statements

McIntosh moved to suppress statements he made to law enforcement following his traffic stop and arrest.  (Dkt. 18.)  The government stated in its opposition brief that it "will not introduce any statements by McIntosh after officers handcuffed him" because none of the officers involved in McIntosh's arrest informed him of his *Miranda* rights.  (Dkt. 53 at 10.)  The Magistrate Judge recommends denial of McIntosh's motion as moot in the light of these statements.  (Dkt. 60 at 1 n.1.)  The Court adopts that recommendation and denies McIntosh's motion to suppress statements as moot.

## IV.   Conclusion

The Court **OVERRULES** Defendant Jasper McIntosh's Objections (Dkt. 70), **ADOPTS** the Magistrate Judge's Report and Recommendation (Dkt. 60), **DENIES** Defendant's Motion to Suppress Evidence (Dkt. 17)

and Motion to Dismiss Superseding Indictment (Dkt. 56), and **DENIES**

Defendant's Motion to Suppress Statements (Dkt. 18) **AS MOOT**.

    **SO ORDERED** this 26th day of December, 2019.


_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE